UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————— )
)
**JEFFREY BODOFF,** *et al.***,** )
)
**Plaintiffs,** )
)
v. )　　　　　　　**Civil Case No.  08–547**
)
**ISLAMIC REPUBLIC OF IRAN,** *et al.***,** )
)
**Defendants.** )
)
———————————————————— )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.    INTRODUCTION

This action against the Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS") arises from an act of state-sponsored terrorism.   The decedent, a United States citizen named Yonathan Barnea, was killed in the Hamas bombing of the Number 18 Egged passenger bus in Jerusalem, Israel, on February 25, 1996.   Plaintiffs are surviving family members and the administrator of Yonathan Barnea's estate. They brought this action against the two defendants under the state-sponsored terrorism exception of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, enacted as part of the National Defense Authorization Act for Fiscal Year 2008 ("NDAA"), Pub. L. No. 110–181, § 1083, 122 Stat. 3, 338–44 (2008).   For the reasons set forth below, the Court finds that plaintiffs have sufficiently proved their causes of action, and determines that defendants may be held liable under the FSIA's updated state-sponsored terrorism exception.

## II.    PROCEDURAL HISTORY

### A.  Prior *Bodoff* Litigation

In 2006, the plaintiffs obtained a judgment from this Court against defendants Iran and Ayatollah Ali Hoseini Khamenei ("Khamenei") under the former state-sponsored terrorism exception, codified at 28 U.S.C. § 1605(a)(7).  *See Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74 (D.D.C. 2006).  The Court found that Hamas was responsible for the attack that killed the decedent and that Iran and Khamenei provided Hamas with extensive material support during the years preceding the attack.  *Id.* at 79–80.  The Court entered judgment awarding plaintiffs compensatory damages against Iran and Khameni, jointly and severally, totaling $16,988,300, and punitive damages against Khamenei totaling $300,000,000.  *Id.* at 86–89; *see also* J., 02–cv–1991, Mar. 29, 2006, ECF No. 38.

### B.  This Action

In January 2008, Congress repealed the old state-sponsored terrorism exception, 28 U.S.C. § 1605(a)(7), and replaced it with an updated version, 28 U.S.C. § 1605A.  Two months later, the plaintiffs filed this action against Iran and MOIS.[1]  *See* Compl., ECF No. 1; *see also Bodoff v. Islamic Republic of Iran*, 567 F. Supp. 2d 141 (D.D.C. 2008) (denying plaintiff's motion for relief under the updated provision in the old case).

The defendants were properly served pursuant to 28 U.S.C. § 1608(a)(4) on July 4, 2012, *see* Return of Service Aff., ECF No. 22, failed to timely appear and answer or otherwise move, and the Clerk entered default on September 19, 2012.  *See* Clerk's Entry of Default, ECF No. 25.

---

[1] It should be noted that, although MOIS was dismissed from the original *Bodoff* case as a defendant, *see* Order, 02-cv-1991, ECF No. 29, certain evidence presented in that case dealt with MOIS, *see* Dr. Paz Aff. ¶¶ 47–51, 02–cv–1991, Oct. 11, 2005, ECF No. 18, as did evidence presented in other cases arising from the same attack in which MOIS was a defendant. *See Weinstein v. Islamic Republic of Iran,* 184 F. Supp. 2d 13, 20 ¶ 30 (D.D.C. 2002)*; Mousa v. Islamic Republic of Iran,* 238 F. Supp. 2d 1, 4 ¶ 11 (D.D.C. 2001)*; Eisenfeld v. Islamic Republic of Iran,* 172 F. Supp. 2d 1, 6 ¶ 23 (D.D.C. 2000). This opinion draws on all of these sources in making findings of fact with respect to MOIS.

On this Court's order, plaintiffs filed Proposed Findings of Fact & Conclusions of Law.  ECF No. 29.

## III.    FINDINGS OF FACT

Based on the record of this case, and facts available for judicial notice—including evidence presented in earlier cases—the Court finds that plaintiffs have "establishe[d] [their] claim or right to relief by evidence that is satisfactory to the Court," as required by 28 U.S.C. § 1608(e).

Specifically, this Court finds the following facts to be established by clear and convincing evidence, which would have been sufficient to establish a prima facie case in a contested proceeding:

1.   Yonathan Barnea was born on July 16, 1976 in Washington, D.C. *Bodoff*, 424 F. Supp. 2d at 78 ¶ 1.  He was a United States citizen from the time of his birth until the time of his death on February 25, 1996.  *Id.* at 78–79 ¶ 1.

2.  Plaintiff Nachum Barnea is the father of decedent Yonathan Barnea.  *Id.* at 79 ¶ 2.

3.  Plaintiff Tamara Barnea is the mother of decedent Yonathan Barnea.  *Id.* ¶ 3.

4.  Plaintiff Shlomit Barnea is the sister of decedent Yonathan Barnea.  *Id.* ¶ 4.

5.  Plaintiff Uri Barnea is the brother of decedent Yonathan Barnea.  *Id.* ¶ 5.

6.   Plaintiff Jeffrey Bodoff brings this action as Administrator of the Estate of Yonathan Barnea.  *Id.* ¶ 6.

7. On the morning of February 25, 1996, Yonathan Barnea boarded the Number 18 Egged bus in Jerusalem, Israel.  *Id.* ¶ 7 (citing Nachum Barnea Aff. ¶ 6, 02–cv–1991, Oct. 12, 2005, ECF No. 21).  At about 6:45 a.m. Jerusalem time, while Yonathan Barnea was still aboard, another passenger detonated explosives at the direction of Hamas which he had carried onto the

bus concealed in a travel bag. *Id.* (citing *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 17 ¶ 9 (D.D.C. 2002); *Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 3 ¶ 3 (D.D.C. 2001); *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 4 ¶ 8 (D.D.C. 2000)). The resulting explosion completely destroyed the bus, scattered debris for at least 100 meters, and led to the injury and death of numerous individuals. *Id.* (citing *Weinstein*, 184 F. Supp. 2d at 17 ¶ 9; *Mousa*, 238 F. Supp. 2d at 3 ¶ 3; *Eisenfeld*, 172 F. Supp. 2d at 4 ¶ 8).

8. As a result of the explosion, Yonathan Barnea was killed. *Id.* ¶ 8 (citing Post-Mortem Rep. (English Trans.) at 1, 4, 02–cv–1991, Oct. 28, 2012, ECF No. 26).

9. Subsequent confessions and other statements to Israeli police and news organizations verified that Hamas was responsible for the attack. *Id.* ¶ 9 (citing *Weinstein*, 184 F. Supp. 2d at 19 ¶ 23; *Mousa*, 238 F. Supp. 2d at 3 ¶ 4; *Eisenfeld*, 172 F. Supp. 2d at 5 ¶ 16).

10. At the time of this attack, "Hamas, the popular name for the Islamic Resistance Movement, [was] an organization supported by The Islamic Republic of Iran, dedicated to the waging of Jihad, or a holy war employing terrorism with the object of seizing the leadership of the Palestinian people and asserting sovereignty and the rule of the Muslim religion over all of Palestine, including all territory of the State of Israel." *Id.* ¶ 10 (quoting *Weinstein*, 184 F. Supp. 2d at 19 ¶ 24; and citing *Mousa*, 238 F. Supp. 2d at 3 ¶ 5; *Eisenfeld*, 172 F. Supp. 2d at 5 ¶ 17).

11. The affidavit testimony of Dr. Reuven Paz, an expert on Islamist Movements, in the first *Bodoff* case establishes conclusively that Iran and MOIS knew of the destructive purposes and objectives of Hamas, which were set forth in detail in the organization's charter. *See* Dr. Paz Aff. ¶¶ 47–51, 02–cv–1991, Oct. 11, 2005, ECF No. 18; *see also Bodoff*, 424 F. Supp. 2d at 79 ¶ 11 (citing *Weinstein*, 184 F. Supp. 2d at 19 ¶ 25; *Mousa*, 238 F. Supp. 2d at 4 ¶ 10).

12.   Defendant Iran provided substantial financial support for Hamas' terrorist activities during the years immediately preceding the attack.  *Id.* at 79 ¶ 12 (citing Dr. Paz Aff. ¶ 47; *Weinstein*, 184 F. Supp. 2d at 19 ¶¶ 26–27); *see also Mousa*, 238 F. Supp. 2d at 3 ¶6; *Eisenfeld*, 172 F. Supp. 2d at 5 ¶¶ 17–20.

13.   Defendant Iran is a foreign state and has been designated a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), continuously since January 19, 1984.  *See* U.S. Dep't of State, Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2836–02, Jan. 23, 1984; U.S. Dep't of State, *State Sponsors of Terrorism*, http://www.state.gov/j/ct/list/c14151.htm; *see also Oviessi*, 2012 WL 3024758 at *5; *Weinstein*, 184 F. Supp. 2d at 20 ¶ 28; *Mousa*, 238 F. Supp. 2d at 4 ¶ 9; *Eisenfeld*, 172 F. Supp. 2d at 5 ¶ 21.

14.   Defendant MOIS is the Iranian intelligence service, functioning both within and beyond Iranian territory.  Acting as an agent of Iran, MOIS acted as a conduit for Iran's provision of funds and training to Hamas, including training to the individual responsible for planning and organizing the bus attack at issue here.  *Weinstein*, 184 F. Supp. 2d at 20 ¶ 30; *Mousa*, 238 F. Supp. 2d at 4 ¶ 11; *Eisenfeld*, 172 F. Supp. 2d at 6 ¶ 23.

15.   Yonathan Barnea's death was caused by a willful and deliberate act of extrajudicial killing because it resulted from an explosion of material intentionally detonated by another passenger acting under instructions from an agent of Hamas.  *Bodoff*, 424 F. Supp. 2d at 79 ¶ 15 (citing *Weinstein*, 184 F. Supp. 2d at 20 ¶ 31; *Mousa*, 238 F. Supp. 2d at 4 ¶ 12; *Eisenfeld*, 172 F. Supp. 2d at 6 ¶ 24).

16.   As a result of the death of Yonathan Barnea, his Estate suffered a loss of accretions that would have been expected to occur during the course of his anticipated life expectancy in the

amount of $1,988,300.  *Id.* ¶ 16 (citing Dr. Ziderman Rep. at 8, 10, 02–cv–1991, Oct. 12, 2005, ECF No. 19).

17.   As a result of the death of Yonathan Barnea, his father, Nachum Barnea, has suffered severe emotional distress.  *Id.* ¶ 17 (citing Nachum Barnea Aff. ¶¶ 6–31).  He suffered anxiety and distress while waiting for confirmation that Yonathan had been on the bus that was destroyed.  *Id.* (citing Nachum Barnea Aff. ¶ 7).  Upon learning that Yonathan was dead, he faced the anguishing tasks of telling his son, Uri, that his older brother was dead, and identifying his eldest son's body.  *Id.* (citing Nachum Barnea Aff. ¶¶ 13–15).

18.   In his testimony in the previous *Bodoff* case, Nachum Barnea stated that he felt an "overwhelming" loss and "tremendous pain" due to the death of his son.  *Id.* ¶ 18 (citing Nachum Barnea Aff. ¶¶ 20, 24).  He and his wife attempted to commemorate their son's life through donations to organizations in which he had been active.  *Id.* (citing Nachum Barnea Aff. ¶ 21).

19.   For many years following the attack, Nachum Barnea suffered from insomnia and anxiety triggered by reminders of the attack.  *Id.* ¶ 19 (citing Nachum Barnea Aff. ¶¶ 17, 25–26).  Holidays and family events brought up painful memories and reminders of the loss of his son.  *Id.* (citing Nachum Barnea Aff. ¶ 27).  In his testimony from the previous case, he spoke of the loss of not getting to see his son grow up, start his own family, and advance in his own career.  *Id.* (citing Nachum Barnea Aff. ¶ 29).

20.   Yonathan Barnea's mother, Tamara Barnea, also suffered severe emotional distress in the days surrounding the attack, and for many years to follow.  *Id.* ¶ 20 (citing Tamara Barnea Aff. ¶¶ 13–33, 02–cv–1991, Oct. 12, 2005, ECF No. 22).  In her testimony in the previous *Bodoff* case, she stated that she felt "terrible anxiety" and "total helplessness" while waiting for confirmation that her son had been a passenger on the bus that was attacked.  *Id.* (citing Tamara

Barnea Aff. ¶ 13).  She made a number of telephone calls in search of her son, but eventually was forced simply to wait for news, during which period her emotional state wavered between hopefulness and despair.  *Id.* (citing Tamara Barnea Aff. ¶¶ 14–18).

21.  Tamara Barnea describes the "devastation" she felt upon learning that her son had been killed, and the pain of never having the opportunity to say goodbye.  *Id.* at 80–81 ¶ 21 (citing Tamara Barnea Aff. ¶¶ 19–20).  For many years after her son's death, she experienced severe anxiety when traveling on a public bus, when traveling near the area of the attack, when in public places, and when her husband or surviving children were outside the home.  *Id.* at 81 ¶ 21 (citing Tamara Barnea Aff. ¶¶ 25–26).  Her distress was sometimes manifested by anxiety attacks, during which she suffered shortness of breath.  *Id.* (citing Tamara Barnea Aff. ¶ 27).

22.  In her testimony in the previous *Bodoff* case, Tamara Barnea spoke of the difficulty of balancing her "inner turmoil" with the pressure of maintaining an appearance of strength for her family's sake.  *Id.* ¶ 22 (citing Tamara Barnea Aff.  ¶ 28).  She felt acutely a sense of loss from the fact that she would not be able to see her son "grow into the person he wanted to be." *Id.*  (citing Tamara Barnea Aff. ¶ 30).  In memory of her son, she and her husband made contributions to organizations in which Yonathan was active, designated parts of his room as a remembrance, distributed photographs of him throughout the house and their workplaces, and visited his grave frequently.  *Id.* (citing Tamara Barnea Aff. ¶¶ 31–32).  These efforts to commemorate her son's life and preserve his memory, however, could not heal the "open wound" that losing a child causes.  *Id.* (citing Tamara Barnea Aff. ¶ 33).

23.  Yonathan Barnea's sister, Shlomit Barnea, also suffered severe emotional distress due to the loss of her brother.  *Id.* at 81 ¶  23.  In her testimony in the previous *Bodoff* case, Shlomit remembered being very close to her older brother. *Id.*  (citing Shlomit Barnea Aff. ¶ 4,

02–cv–1991, Oct. 12, 2005, ECF No. 23).  They spent a great deal of time together and she felt

that he supported her.  *Id.* (citing Shlomit Barnea Aff. ¶ 4).

24.  In her testimony in the previous *Bodoff* case, Shlomit Barnea described the anguish

she suffered while it was unclear whether her brother had been killed, and the shock and pain she

felt upon receiving confirmation of his death.  *Id.* at 81 ¶ 24 (citing Shlomit Barnea Aff. ¶¶ 7–

11).  The loss of her brother was particularly difficult because she did not have an opportunity to

say goodbye, and she felt as though she was left alone to contend with a range of conflicting

emotions relating to the fact that her relationship with her brother was cut short.  *Id.* (citing

Shlomit Barnea Aff. ¶¶ 12–13).

25.   Shlomit Barnea also described lingering anxiety arising from sirens, bus

transportation or being in the vicinity of the attack site.  *Id.* at 81 ¶ 25 (citing Shlomit Barnea Aff.

¶¶ 14, 19).  While she tried to move on with her life, the death of her brother had indelibly

marked her identity and she had been unable to escape her grief.  *Id.* (citing Shlomit Barnea Aff.

¶¶ 16, 19–22).

26.  Uri Barnea, the youngest child in the Barnea family, also suffered severe emotional

distress from the loss of his big brother.  *Id.* at 81 ¶  26 (citing Uri Barnea Aff. ¶¶ 2–18, 02–cv–

1991, Oct. 12, 2005, ECF No. 24).  Uri admired his older brother, and felt fortunate that his

brother helped him with homework, supported him, and treated him like a friend.  *Id.* (citing Uri

Barnea Aff. ¶¶ 3–5).  On the day of the attack, Uri experienced—along with his family—the

anguish of not knowing what had happened to his brother.  *Id.* (citing Uri Barnea Aff. ¶¶ 7–10).

As a young child at the time, it was particularly distressing for him to see his family so upset.  *Id.*

(citing Uri Barnea Aff. ¶ 10).

27.  As expressed by other members of the family, Uri also found it painful to have no opportunity to say goodbye to his brother.  *Id.* at 81 ¶ 27(citing Uri Barnea Aff. ¶ 11).  He felt that he lost some of his innocence as a result of his brother's death, and no longer viewed the world with the same feelings of optimism and security.  *Id.* (citing Uri Barnea Aff. ¶¶ 12–15).  He described the pain of missed opportunities to spend time with his brother and of knowing that his brother could not watch him grow up.  *Id.* at 81–82 ¶ 27 (citing Uri Barnea Aff. ¶¶ 15–16).

28.  Uri also suffered continued distress relating to his changed relationship with his parents.  *Id.* at 82 ¶ 28 (citing Uri Barnea Aff. ¶ 17).  He felt restricted by their heightened fear for his safety, but he also felt obligated to comply with their requests so as to minimize their distress.  *Id.* (citing Uri Barnea Aff. ¶ 17).  Uri described the deep pain of losing his brother as one that he would carry for the rest of his life, something that others could not understand.  *Id.* (citing Uri Barnea Aff. ¶ 18).

## IV.   CONCLUSIONS OF LAW

Based on these findings of fact, the Court reaches the following conclusions of law.

### A.  Jurisdiction and Sovereign Immunity

The FSIA provides immunity to foreign states from suit and denies United States courts jurisdiction over such actions.  28 U.S.C. § 1604.  Under certain conditions, however, courts obtain original jurisdiction for suits against foreign states, and those states' immunities are waived by statute.  Based on the evidence here, these conditions have been met.

#### 1.  Original Jurisdiction

The state-sponsored terrorism exception provides that federal courts possess original jurisdiction over suits against a foreign state only if (1) "money damages are sought," (2) "against a foreign state" for (3) "personal injury or death" that (4) "was caused" (5) "by an act of

torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act . . . ."  28 U.S.C. § 1605A(a)(1); *see also Oveissi v. Islamic Republic of Iran*, 2012 WL 3024758 at *4 (D.D.C. July 25, 2012).

Here, each of these prerequisites is met.  First, plaintiffs' complaint only seeks "money damages."  *See* Compl. at 10–11, ECF No. 1.  Second, defendant Iran is plainly a foreign state.  With respect to defendant MOIS, the FSIA defines foreign state to include "a political subdivision . . . . or an agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  Applying this definition, this Court finds (as it has previously) that MOIS is a political subdivision of Iran, and so "is treated as a member of the state of Iran itself."  *Valore*, 700 F. Supp. 2d 52 at 65 (quoting *Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117, 125 (D.D.C. 2007) (citing *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003))).  Third, the Complaint contains claims arising out of the murder of Yonathan Barnea—claims that involve "personal injury or death" under FSIA § 1605A(a)(1).  *See* Compl. ¶ 1.  Fourth, the evidence establishes that defendant Iran provided substantial support for Hamas' terrorist activities for the purpose of undertaking attacks such as the February 1996 bus bombing in which Yonathan Barnea was killed, funneled money and material support to Hamas through defendant MOIS, and also demonstrates that both defendants played necessary planning, logistical and support roles leading up the bus bombing.  *See Bodoff*, 424 F. Supp. 2d at 79–80 ¶¶ 7–15; *Weinstein*, 184 F. Supp. 2d at 20 ¶¶ 24–30; *Mousa*, 238 F. Supp. 2d at 4 ¶¶ 5–11; *Eisenfeld*, 172 F. Supp. 2d at 6 ¶¶ 17–23.  This evidence satisfies the FSIA's requirement of a causal connection between the act or omission of the defendant and the damages which the plaintiffs have suffered.  *See Valore*, 700 F. Supp. 2d 52 at 66 (noting that FSIA requires only a "reasonable" connection, not "but-for" causation); *Oviessi*, 2012 WL 3024758 at *4.  Finally, the 1996 bus bombing

constitutes an extrajudicial killing that occurred as a direct and proximate result of defendants' provision of assistance to Hamas and its operatives.  On the basis of these findings, the Court has original jurisdiction over plaintiffs' claims.

### 2.  Waiver of Sovereign Immunity

While this Court's exercise of jurisdiction over this action is a necessary prerequisite to moving forward, foreign states remain immune from suit absent a waiver of sovereign immunity. *Oviessi*, 2012 WL 3024758 at *5.  The state-sponsored terrorism exception provides that such waiver occurs where (1) "the foreign state was designated as a state sponsor of terrorism at the time of the act . . . and . . . remains so designated when the claim is filed under this section . . . " (2) "the claimant or the victim was, at the time of the act . . . a national of the United States . . ." and (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim."  28 U.S.C. § 1605A(a)(2)(A)(i)–(iii).  Here, the facts warrant waiver of defendants' sovereign immunity.  First, Iran has been designated as a state sponsor of terrorism continuously since January 1984 through the present. *See* U.S. Dep't of State, Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2836–02, Jan. 23, 1984;  U.S.    Dep't    of    State,    *State    Sponsors    of    Terrorism*, http://www.state.gov/j/ct/list/c14151.htm; *see also Oviessi*, 2012 WL 3024758 at *5; *Weinstein*, 184 F. Supp. 2d at 20 ¶ 28; *Mousa*, 238 F. Supp. 2d at 4 ¶ 9; *Eisenfeld*, 172 F. Supp. 2d at 5 ¶ 21. Second, decedent, Yonathan Barnea, was a United States citizen up to the time of his death. *Bodoff*, 424 F. Supp. 2d at 78–79 ¶ 1.  Finally, the murder occurred in Israel, not Iran, so the FSIA's requirement that defendants be given an opportunity to arbitrate this claim is inapplicable.  For these reasons, defendants' immunity is waived and they may be held liable.

### B.      Liability

Section 1605A(c) creates a federal private right of action for victims of state-sponsored terrorism.   A plaintiff can seek to hold a foreign state liable for (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" where (2) the act was committed, or the provision provided, by the foreign state or agent of the foreign state, and the act (3) "caused" (4) "personal injury or death" (5) "for which courts of the United States may maintain jurisdiction under this section for money damages."  28 U.S.C. § 1605A(a)(1), (c).  As the Court has discussed at length elsewhere, the third and fourth elements—causation and injury—"require plaintiffs to prove a theory of liability" in which plaintiffs justify the damages they seek, generally expressed "through the lens of civil tort liability."  *Rimkus*, 750 F. Supp. 2d at 176.

The Court will now apply the facts of this case to each of these elements in turn.

### 1. Act

Through evidence presented in the first *Bodoff* case, 424 F. Supp. 2d 74, and other cases arising from the same bus bombing, *Weinstein*, 184 F. Supp. 2d 13; *Mousa*, 238 F. Supp. 2d 1; *Eisenfeld*, 172 F. Supp. 2d 1, plaintiffs have sufficiently established that defendants were responsible for the murder of Yonathan Barnea in 1996.  The evidence concerning the actions of defendants Iran and MOIS demonstrates that they are culpable both for the extrajudicial killing of Yonathan Barnea and for the provision of material support to the Hamas members involved in the bus bombing, in satisfaction of the first requirement of liability under § 1605A.

FSIA defines extrajudicial killing by reference to Section 3 of the Torture Victim Protection Act of 1991.  *See* 28 U.S.C. § 1605A(h)(7).  That Act defines an extrajudicial killing as

> a deliberated killing not authorized by a previous judgment pronounced by a
> regularly constituted court affording all judicial guarantees which are recognized
> as indispensable by civilized peoples.

Torture Victim Protection Act of 1991 § 3(a), 28 U.S.C. § 1350 note.  The evidence establishes

that Yonathan Barnea's death was caused by a willful and deliberate act resulting from an

explosion of material carried aboard a bus and intentionally detonated by another passenger

acting under instructions from Hamas.  There is no evidence that this order was sanctioned by

any judicial body.  Based on these findings, the murder of Yonathan Barnea constitutes an

extrajudicial killing, undertaken by Hamas acting as agent for defendants Iran and MOIS.

The FSIA declares that the concept of "material support or resources" is defined by

reference to the federal criminal code.  28 U.S.C. § 1605A(h)(3).  That definition states that

support

> means any property, tangible or intangible, or service, including currency or
> monetary instruments or financial securities, financial services, lodging, training,
> expert advice or assistance, safehouses, false documentation or identification,
> communications equipment, facilities, weapons, lethal substances, explosives,
> personnel . . . and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

The evidence demonstrates that during the period leading up to the bus bombing, Iran and

MOIS supported Hamas for the purpose of advancing their own agendas.  *See Bodoff*, 424 F.

Supp. 2d at 79 ¶ 12; *Weinstein*, 184 F. Supp. 2d at 19–20 ¶¶ 26–27, 30; *Mousa*, 238 F. Supp. 2d

at 3–4 ¶¶ 6, 11; *Eisenfeld*, 172 F. Supp. 2d at 5–6 ¶¶ 17–20, 23.  At the time of the attack, Hamas

was a terrorist organization intent on waging "holy war," and was supported tangibly and

financially by Iran and MOIS.  *Bodoff*, 424 F. Supp. 2d at 79 ¶¶ 10, 12; *Weinstein*, 184 F. Supp.

2d at 19–20 ¶¶ 24, 26–27, 30; *Mousa*, 238 F. Supp. 2d at 3–4 ¶¶ 5–6, 11; *Eisenfeld*, 172 F. Supp.

2d at 5–6 ¶¶ 17–20, 23.   These acts constitute the provision of material support for FSIA purposes.

### 2.   Actor

The evidence presented establishes that Hamas acted as an agent for Iran and MOIS during 1996.  *Bodoff*, 424 F. Supp. 2d at 79 ¶¶ 10, 12; *Weinstein*, 184 F. Supp. 2d at 19–20 ¶¶ 24, 26–27, 30; *Mousa*, 238 F. Supp. 2d at 3–4 ¶¶ 5–6, 11; *Eisenfeld*, 172 F. Supp. 2d at 5–6 ¶¶ 17–20, 23.   Under such circumstances, defendants may be held vicariously liable for the extrajudicial killing perpetrated by the suicide bomber.

### 3.   Theory of Recovery—Causation

The elements of causation and injury in § 1605A require FSIA plaintiffs "to prove a theory of liability" which justifies holding the defendants culpable for the injuries that the plaintiffs have allegedly suffered.  *Oviessi*, 2012 WL 3024758 at *7 (citing *Valore*, 700 F. Supp. 2d at 73); *see also Rimkus*, 750 F. Supp. 2d at 175–76 ("[P]laintiffs in § 1605A actions . . . must articulate the justification for such recovery, generally through the lens of civil tort liability."). When determining the contours of these theories, the D.C. Circuit has cautioned that while the "extent and nature" of such claims "are federal questions," the FSIA "does not . . . authorize the federal courts to fashion a complete body of federal law."  *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003).   Based on the Circuit's guidance, district courts in this jurisdiction "rely on well-established principles of law, such as those found in Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions" to outline the boundaries of these theories of recovery. *Oviessi*, 2012 WL 3024758 at *7 (quoting *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009)).

The Court finds that MOIS was a division of the State of Iran which acted as a conduit for Iran's provision of funds and training to Hamas, including training to the individual responsible for planning and organizing the bus attack at issue here.  *Weinstein*, 184 F. Supp. 2d at 20 ¶ 30; *Mousa*, 238 F. Supp. 2d at 4 ¶ 11; *Eisenfeld*, 172 F. Supp. 2d at 6 ¶ 23.

In the prior *Bodoff* litigation, plaintiffs received relief under District of Columbia law for wrongful death and intentional infliction of emotional distress ("IIED") and received a judgment for compensatory damages against Iran and Khameinei in the amount of $16,988,300, and punitive damages against Khamenei in the amount of $300,000,000.  *Bodoff*, 424 F. Supp. 2d at 85–89.  Here, the Court must ensure that plaintiffs also satisfy the requirements for an award under § 1605A(c).

In the first *Bodoff* case, the Court concluded that "civil conspiracy provide[d] a basis of liability for defendants Iran and Khamenei" and that "the elements of civil conspiracy [were] established between the defendants . . . and the actual perpetrators of the attack."  424 F. Supp. 2d at 84.  The Court also found that, under District of Columbia law, Iran and Khamenei were liable for the wrongful death of Yonathan Barnea, *id.* at 85, and for intentional infliction of emotional distress as to each plaintiff, *id.* at 85–86.

This Court and others have frequently addressed the IIED theory following enactment of § 1605A. *See, e.g.*, *Fain v. Islamic Republic of Iran,* 856 F. Supp. 2d 109, 123 (D.D.C. 2012). Relying principally on the Restatement, courts have set forth the following standard: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C.2009) (citing Restatement (Second) of Torts § 46(1)). Here, the Court finds that this test

is satisfied by taking judicial notice of its finding in the first *Bodoff* case that the District of Columbia's IIED standard (virtually identical to this one) was satisfied. "First, a terrorist attack constitutes extreme and outrageous conduct." *Bodoff*, 424 F. Supp. 2d at 85 (citing *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002). Second, "the emotional distress caused to plaintiffs was intentionally or recklessly caused by the suicide bomber by virtue of the act itself." *Id.* And third, "each of Yonathan Barnea's surviving family members in this case have established in great detail the severe emotional distress that resulted from the attack." *Id.*

The scope of recovery under the IIED theory is limited by two qualifications: the plaintiff must be "a member of [the injured person's] immediate family" and must be "present at the time." *Fain*, 856 F. Supp. 2d at 123–24 (quoting Restatement (Second) of Torts § 46(2)(a)–(b)). The former qualification is of no consequence here, as plaintiffs are either the parents or siblings of the decedent, and thus fall within even the strictest definition of immediate family. *See Valore*, 700 F.Supp.2d at 79 (noting that immediate family "is consistent with the traditional understanding of one's immediate family" and includes "one's spouse, parents, siblings, and children").

The issue of presence, however, warrants a bit more discussion. None of the plaintiffs in this action were present and witnesses to the bus attack. However, this Court has previously recognized that the presence requirement is subject to a caveat—specifically, the Restatement "'expresses no opinion as to whether there may not be other circumstances under which the actor may be subject to liability.'" *Heiser*, 659 F. Supp. 2d at 26–27 (quoting Restatement (Second) of Torts § 46). As the *Heiser* Court explained: "Terrorism [is] unique among the types of tortuous activities in both its extreme methods and aims . . . 'All acts of terrorism are by the very definition extreme and outrageous and intended to cause the highest degree of emotional distress,

literally, terror.'" *Id*. at 27 (quoting *Stethem*, 201 F. Supp. 2d at 89). Thus, the Court concluded

that a plaintiff "need not be present at the place of outrageous conduct, but must be a member of

the victim's immediate family." *Id*.

Thus, the Court is warranted in finding that the plaintiffs satisfy the causation

requirement for an award against both defendants herein under the federal cause of action in

FSIA §1605A(c).

### 4. Personal Injury

This Court has already determined that plaintiffs have brought an action for "personal

injury or death" by bringing a claim arising out of the extrajudicial killing of Yonathan Barnea.

### 5. Jurisdiction

The Court has already determined that it is proper to exercise jurisdiction over defendants

in this action, and that plaintiffs are only seeking monetary compensation.  This final element is

thus satisfied, and defendants may be properly held liable and their award may be confirmed

under the federal cause of action embodied in 28 U.S.C. § 1605A(c) for the 1996 murder of

Yonathan Barnea.

## V. DAMAGES

Damages available under the FSIA-created cause of action "include economic damages,

solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c)(4).  To obtain

damages against defendants in an FSIA action, the plaintiff must prove that the consequences of

the defendants' conduct were "reasonably certain (i.e., more likely than not) to occur, and must

prove the amount of the damages by a reasonable estimate consistent with this [Circuit's]

application of the American rule on damages."  *Oviessi*, 2012 WL 3024758 at *8 (quoting

*Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (quoting *Hill v.*

*Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003))).  As found in the initial *Bodoff* litigation, plaintiffs have proven that the defendants' commission of acts of extrajudicial killing and provision of material support and resources for such killing was reasonably certain to, and indeed intended to, cause injury to plaintiff.  *Bodoff*, 424 F.Supp. 2d 74.  Thus, damages are appropriate.

> **A.      Compensatory Damages**

In the prior *Bodoff* litigation, the Court awarded compensatory damages in favor of all plaintiffs against defendants Iran and Khamenei, jointly and severally, in the amount of $16,988,300, and punitive damages of $300,000,000 in favor of the administrator of the decedent's estate as against Khamenei.

Here, the Court will confirm the prior compensatory damages judgment, now extended to defendant MOIS.  Thus, plaintiffs shall be awarded a judgment in their favor and against defendants Iran and MOIS, jointly and severally, in the amount of $16,988,300. The award shall be distributed among plaintiffs in the same manner as this Court ruled in the first *Bodoff* case.

This judgment shall be enforceable under the terms of the newly enacted statute. In order to avoid double recovery, plaintiffs may not seek to enforce the prior judgment for $16,988,300.

> **B.      Punitive Damages**

"Punitive damages, made available under the revised FSIA terrorism exception, serve to punish and deter the actions for which they are awarded."  *Oviessi*, 2012 WL 3024758 at *9 (citing *In re Islamic Republic of Iran Terrorism Litig.*, 659 F.Supp.2d at 61; *Heiser*, 659 F. Supp. 2d at 29–30; *Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008); Restatement (Second) of Torts § 908(1)).  "Punitive damages are not meant to compensate the victim, but instead meant to award the victim an amount of money that will punish outrageous behavior and deter such outrageous conduct in the future."  *Id.*  In determining the proper

18

punitive damages award, courts evaluate four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Acosta*, 574 F. Supp. 2d at 30.

Here, the nature of the defendants' act and the nature and extent of the harm defendants intentionally caused are among the most heinous the Court can fathom. *Bodoff*, 424 F. Supp. 2d at 88 (determining this bus bombing to be "extremely heinous"). "The defendants' demonstrated policy of encouraging, supporting and directing a campaign of deadly terrorism is evidence of the monstrous character of the bombing that inflicted maximum pain and suffering on innocent people." *Id.* (quoting *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 278 (D.D.C. 2003)).

As to deterrence and wealth, Iran is a foreign state with substantial wealth that has expended significant resources sponsoring terrorism. *See Oviessi*, 2012 WL 3024758 at *9. Dr. Patrick Clawson, an expert on Iranian terrorism activities, has testified in several cases on the amounts of punitive damages that would serve to deter Iran from supporting terrorist activities against nationals of the United States. *See, e.g., Flatow*, 999 F. Supp. at 32; *Heiser*, 659 F. Supp. 2d at 30. Dr. Clawson declared that "the financial material support provided by Iran in support of terrorism is in the range of $300 million to $500 million a year." Clawson Aff. ¶ 4, *Valore*, 700 F. Supp. 2d 52 (03–cv–1959, ECF No. 58). Dr. Clawson based his range on Iran's provision of approximately $200 million in direct cash assistance to Hezbollah in 2008, as well as the provision since 2006 of "many tens of millions of dollars" worth of sophisticated weaponry, including some 40,000 rockets. *Id.* ¶ 3.a. (citing U.S. Dep't of State, Country Reports on Terrorism 2008, at 183 (2009), *available at* http:// www.state.gov/documents/organization/122599.pdf). In addition, the Court finds it appropriate

to examine awards that courts have issued in similar state-sponsored terrorism cases. *See Oviessi*, 2012 WL 3024758 at *10. Considering similar cases will assist this Court in following the Supreme Court's instruction that a punitive damages award be "reasonably predictable in its severity . . . so that [a] . . . bad man can look ahead with some ability to know what the stakes are in choosing one course of action or another." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 502, (2008).

In *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 75 (D.D.C. 2008), Judge Collyer awarded a total of $300,000,000 ($150,000,000 per victim) in punitive damages against Syria for the beheading of two civilian contractors. Similarly, in Acosta, this Court awarded $300,000,000 in punitive damages against Iran for the 1990 assassination of Rabbi Kahane and wounding of two other American citizens in New York City. 574 F. Supp. 2d at 30–31. Magistrate Judge Facciola awarded a total of $450,000,000 ($150,000,000 per victim) to the families of three victims executed during the hijacking of Egypt Air Flight 648. *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011). In his survey of FSIA punitive damages cases, Magistrate Judge Facciola noted that "this Court had, with one exception, never awarded an amount higher than $300,000,000 in punitive damages against Iran." *Id*. In *Wultz v. Islamic Republic of Iran*, this Court awarded $300,000,000 in punitive damages arising out of a terrorist bombing at a Tel Aviv restaurant that severely wounded a father and killed his teenage son. 864 F. Supp. 2d 24 (D.D.C. 2012). Therefore, this Court finds that it is appropriate to award plaintiffs $300,000,000 in punitive damages.

However, there is one more step to the inquiry. This Court must consider whether a $300,000,000 punitive damages award comports with recent Supreme Court guidance on punitive damages. This Court addressed this issue at length in *Beer v. Islamic Republic of Iran*,

where it held that foreign sovereigns cannot use the constitutional constraints of the Fifth Amendment due process clause to shield themselves from large punitive damages awards and that this Court's longstanding method for the calculation of punitive damages in FSIA terrorism cases remains viable. 789 F. Supp. 2d 14, 16–26 (D.D.C. 2011). Therefore, plaintiff is entitled to $300,000,000 in punitive damages.

This Court already awarded $300,000,000 in punitive damages against Khamenei in the prior *Bodoff* litigation. 424 F. Supp. 2d at 89. The defendants' actions are no less heinous now. Accordingly, this Court confirms its prior award in the amount of $300,000,000 in punitive damages in favor of plaintiffs, and now extends that award under § 1605A against Iran and MOIS, jointly and severally.

Judgment in the previous case is not vacated because Khamenei is not a party in this case. The outstanding judgment from that case in the amount of $ 300,000,000 against Khamenei shall remain outstanding.

## VI.     CONCLUSION

Based upon the foregoing, the Court finds that the plaintiffs have established their case under FSIA §1605A warranting the Court in: (a) entering final judgment in favor of plaintiffs under § 1605A; (b) confirming its prior award of compensatory damages of $16,988,300 in favor of plaintiffs now applicable against both defendants here under § 1605A; and (c) confirming the award of punitive damages of $300,000,000 now against both defendants here under § 1605A.

A separate order and judgment consistent with these findings shall issue on this date.

Signed December 3, 2012 by Royce C. Lamberth, Chief Judge.